UNITED STATES of America,
Plaintiff-Appellee,

v.

VARIOUS SLOT MACHINES ON
GUAM, Defendants,

and

Amanda Guzman Shelton,
Claimant-Appellant.

No. 79–4390.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1981.

Decided Oct. 5, 1981.

Stephen A. Cronin, Cronin & Associates, P.C., Agana, Guam, for claimant-appellant.

Richard W. Beebe, Washington, D. C., for plaintiff-appellee.

Before DUNIWAY and ALARCON, Circuit Judges, and BYRNE,* District Judge.

DUNIWAY, Circuit Judge:

Appeal from a judgment forfeiting 9 machines alleged to be gambling machines as defined in 15 U.S.C. § 1171(a)(1) and (2) and subject to forfeiture under 15 U.S.C. § 1177 for violation of 15 U.S.C. § 1172, by having been transported to Guam. The government moved for summary judgment and that motion was granted.

* The Honorable William Matthew Byrne, Jr., United States District Judge for the Central District of California, sitting by designation.

## I. *The Summary Judgment.*

Section 1171(a)(1) defines "gambling device" to mean: "any so-called 'slot machine' or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property. . . ."

Section 1171(a)(2) defines "gambling device" to mean: "any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and" (A) as above or (B) as above.

The government's motion is supported by two affidavits. One affidavit, by FBI Agent Leahy, describes the machines as follows:

(a) that the devices were manufactured outside the Territory of Guam and such devices are not now or ever has [sic] been manufactured within the Territory;

(b) the devices are described as follows: coin-activated, mechanically-operated machines. Each device when assembled and ready for use has a verticle [sic] standing cabinet housing three or more narrow cylindrical drums commonly called reels which are marked with numbers or symbols. Vertically disposed on a common axis, the reels are caused to revolve freely when a player activates the machines by pulling a lever affixed in the side of the cabinet. The power is essentially the mechanical impact of spring-loaded reel impellers. . . . Awards which are recorded automatically are based on the horizontal alighment [sic] of symbols when the reels are at rest. The awards are recorded on a replay register. . . .

Each machine has a replay register which is a multi-digit counting meter which records the awards or free games won. Free games so recorded may be used by depressing appropriate buttons to activate the mechanism which controls the increase of free games awards thus decreasing the number showing each time by the replay register by one. Additionally the replay register may be cleared by an apparatus or an on/off switch located on the device or by disconnecting the device from its power source.

Within the device are two additional meters, the total plays meter and the replays meter. The former records the number of coins inserted in the device and the number of free plays used in the play of the machine. The replays meter records the total free plays which have been won. Subtracting the total registered on the replay meter and the total of coins in the machine from the total registered on the total plays meter will result in the number of free games eliminated from the machine without being used in play.

All of the said devices were transported into Guam via interstate or foreign commerce after December 17, 1962.

The other affidavit, by FBI Agent Green, states,

5. That based on my personal inspection of the exteriors and interiors of these machines, I can state the following:

(a) Each machine contains slots for insertion of coins of various denominations;

(b) Each machine operates through the use of reels or drums with various insignia on them;

(c) Each machine contains a pay-out tray for the return of jackpots or other awards;

(d) Each machine contains a lever on the side, which when pulled, activates the machines;

(e) Each machine was manufactured outside of Guam;

(f) Each machine contains conspicuous language on the exterior portions referring variously to money awards, jackpots, etc.

This affidavit also placed before the court photographs of four of the machines, stated by the witness to be typical of the nine.

Testimony in another case by the claimant, one Shelton, states, in reference to the nine machines:

> Q . . . You did not manufacture these machines; is that correct?
>
> A No, not any of them entirely. Some of them have conversions that were done locally.
>
> Q Were these machines received from outside of Guam by you?
>
> A Yes.

These affidavits and Shelton's admission are sufficient to sustain a summary judgment, and place upon the claimant the burden imposed by Rule 56(e) F.R.Civ.P.:

> his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate shall be entered against him.

The claimant's affidavits are insufficient to meet this requirement.

■ One affidavit, by claimant Shelton, asserts that the machines are not gambling machines but are "Electronic Point-Maker Machines." He offers no facts to support the assertion. For all that appears, the label "Electronic Point-Maker" is one that applies to the machines described in the FBI affidavits and in § 1171(a)(1) and (2). Next, he says that it is untrue "that such devices are not now nor ever have been manufactured" in Guam, and that "similar" devices have been manufactured in Guam. Significantly, he does *not* say that any of the 9 machines was manufactured in Guam. Next, he denies that the reels are vertically disposed on a common axis. He does *not* deny that the reels are vertical and/or that the axis is horizontal. He simply misreads the affidavits as stating that the reels are stacked on a vertical axis. He denies that the power that causes the reels to turn is mechanical and alleges that it is electrical. He says there is no "replay register," but also says that "either the player wins or he loses," and that some of the machines have a "counter," which can be cleared by a key control. None of Shelton's denials or allegations sustains his claim that the machines

are not gambling devices. The affidavit is 5½ legal-size pages of pettifoggery.

A second affidavit is by one Pangelinan. He, too asserts, without supporting facts, that the machines are "Electronic Point-Maker Machines." His affidavit is 2½ pages of quibble. A supplemental affidavit by Pangelinan is no better. He does, however, make one factual allegation in response to Agent Green's affidavit:

> For example, "each machine" *does not* contain slots for the insertion of coins of various denominations." "Each machine" *does not* have a "return of jackpots or other awards."

As the court noted, however, the photographs show that the machines have slots to receive coins and trays for payouts or jackpots. In response, all that counsel could come up with is this: "Judge we're not arguing with the photos. We're not saying that the photos are wrong. The Government hasn't done any more than we have done. We're not saying that these photos don't accurately portray the machines. But the Government hasn't shown any type of photographs showing some kind of a cash payout or monies floating out of these machines." As § 1171(a)(1)(B) demonstrates, that response, too, is mere pettifoggery. Under (B), it is enough that a person may *become entitled to receive money or property.* It need not come to him in a jackpot tray. And when the court remarked that the mere assertion that the machines are electronic point-makers is a conclusion, and asked, "where in the affidavit[s] do they present facts to the court to convince the court that these are *electronic pointmakers?*", counsel's reply was, "Well, we don't have a specific description of exactly why they are pointmakers." If he had omitted the word "exactly," his response would have been exact.

Both Shelton and Pangelinan state in their affidavits that they have had extensive experience "in the maintenance, repair and operation of coin-operated machines" (Shelton), and training in their "manufacture and characteristics" (Pangelinan). Shelton also says that:

I have attended the National Institute of Coin Machines School in Denver, Colorado and the Texas State Technical Institute School in Waco, Texas and have more than fifteen (15) years experience in the coin-operated machine business.

Pangelinan says:

I am the manager of Leisure Games, Inc., a coin-operated machine business located in Tamuning, Territory of Guam. I was formerly the Manager of Bally Guam Corporation which was a branch of Bally Manufacturing Company, Chicago, the manufacturer of *all* the machines identified in this case as the nine (9) Defendant machines.

. . . .

Based upon my extensive managerial experience at Bally Guam Corporation and my more than twenty (20) years experience in the coin-operated machine business, I have reviewed the affidavit of FBI Agent Lawrence L. Leahy concerning the nine (9) machines identified in this case as "Various Slot Machines on Guam."

We assume, on the basis of the foregoing, that each of them qualifies as an expert on coin-operated machines.

It can be argued that this brings into play rules 702–705, F.R.Evid., which permit an expert to testify "in the form of an opinion" (rule 702), which "is not objectionable because it embraces an ultimate issue to be decided" (rule 704). Rule 705 permits the expert "to testify in terms of opinion . . . without prior disclosure of the underlying facts or data, unless the court requires otherwise." The conclusion of the argument is that Shelton's and Pangelinan's statements that the machines are not gambling machines, and that they are electronic point-makers, are in themselves sufficient to show that there is a "genuine issue as to any material fact" (F.R.Civ.P. 56(c)), thus defeating the motion for summary judgment. To put it in another way, it can be argued that an expert's conclusion or opinion meets the requirement of Rule 56(e) that the party opposing the motion "must set forth specific facts showing that there is a genuine issue for trial."

To begin with, we have difficulty with the notion that to state an opinion is to set forth specific facts. Be that as it may, we also think that, in the context of a motion for summary judgment, an expert must back up his opinion with specific facts. This was obviously Judge Duenas' view when he asked counsel "where in the affidavits do they present facts?" As we have seen, counsel admitted that they weren't in the affidavits. Moreover, he made no offer to come forward with such facts by way of a supplemental affidavit or otherwise.

Our view is shared by the Court of Appeals for the D.C. Circuit. In *Merit Motors, Inc. v. Chrysler Corp.*, D.C. Cir., 1977, 569 F.2d 666, Judge J. Skelly Wright, speaking for the court, said:

On appeal appellants attempt to salvage their expert's opinion by relying on cases applying Rule 703 of the Federal Rules of Evidence, adopted in 1975. This rule was intended to broaden the acceptable bases of expert opinion, but it was not intended, as appellants seem to argue, to make summary judgment impossible whenever a party has produced an expert to support its position. Even Rule 703 requires that the grounds relied on by an expert must be "a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject." While appellants claim that Staelin has merely applied "standard economic theory" to "a factual basis which is uncontroverted," it is obvious that Staelin makes unsupported assumptions about the elasticities of demand in various markets and that he virtually ignores the impact of the dominant forces in the automobile market: General Motors and Ford. To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than Staelin's theoretical speculations would seriously undermine the policies of Rule 56. We are unwilling to impose the fruitless expenses of litigation that would result from such

a limitation on the power of a court to grant summary judgment. *Id.* at 672–3 (footnotes omitted).

We have reversed the grant of summary judgment, in reliance on an expert's affidavit. But in that case, the expert stated facts to back up his conclusion. *See Bieghler v. Kleppe,* 9 Cir., 1980, 633 F.2d 531.

■ In short, we hold that the claimant's affidavits do not comply with Rule 56(e). They do not "set forth specific facts showing that there is a genuine issue for trial." The conflict between the government photographs and the Pangelinan affidavit is not genuine. Even on a motion for summary judgment, a court is not compelled to give weight to an allegation that is incontrovertibly demonstrated to be false.

It was not error to enter a summary judgment for the government. It would be an imposition on the trial judge, and make a mockery of summary judgment procedure, to hold otherwise.

II. *Cost of Storing Seized Property.*

■ The court awarded, as costs, the amount paid by the Marshal for storage of the machines. This is provided for by 28 U.S.C. §§ 1920 and 1921. There was no error.

III. *Exemption.*

■ Guam Public Law No. 13–135 provides only a limited exemption to 15 U.S.C. § 1172, and the court correctly concluded

that the exemption was not applicable to the machines in this case and that there was no dispute of material fact on this question.

Affirmed.

WM. MATTHEW BYRNE, Jr., District Judge, dissenting:

I respectfully dissent. I believe that the district court should have denied the motion for summary judgment because the Government did not present evidence to establish that the machines in question were within either of the statutory definitions of "gambling device." [1] At the very least, the affidavits presented to the district court raise a genuine issue of material fact as to whether each machine meets each element of either of the definitions.

I

To come within the definition of "gambling device" under § 1171, a machine must, as an initial matter, be either a "slot machine" (§ 1171(a)(1)) or "any other machine or mechanical device ... designed and manufactured primarily for use in connection with gambling" (§ 1171(a)(2)). The district court, in granting the motion for summary judgment, stated that "there can be no question that these machines are gambling devices," without indicating under which definition it so found.[2] The majority, however, apparently finds, that the

1. The statutory definitions of § 1171(a)(1) and § 1171(a)(2) are set forth at Majority Opinion at 698.

2. The district court's failure to so indicate may have resulted from the Government's vacillation between definitions (a)(1) and (a)(2) in contending that the machines were "gambling devices." In the Complaint for Forfeiture, the Government was apparently proceeding under § 1171(a)(2)(B). It alleges that the machines are "gambling devices," within the meaning of § 1171(a), "because they have been designed and manufactured primarily for use in connection with gambling and are devices by the operation of which a person may become entitled to receive ... money or property."

In Special Agent Leahy's Affidavit in support of the Complaint, he states that the machines are in violation of § 1171 and avers certain characteristics of "[e]ach machine" that would place them within either (a)(1) or (a)(2).

In its Motion for Summary Judgment, the Government states that all of the machines are within definition (a)(1), arguing, however, from the Gambling Devices Act of 1962, Pub.L. No. 87–840, 76 Stat. 1075, which only affected definition (a)(2).

In its Reply memorandum, the Government apparently was contending that the machines fell within definition (a)(1). It pointed out that each machine contained a "slot," a pay-off or jackpot tray for the return of coins, and a drum or reel pivotal to its operation and underscored for emphasis certain portions of (a)(1).

machines are "gambling devices" within definition (a)(1).[3]

The first element of § 1171(a)(1) is that a "so-called 'slot machine' or any other machine" must have, as an "essential part," a "drum or reel with insignia thereon." The Affidavit of Special Agent Leahy states that each machine has "reels which are marked with numbers or symbols." Although affidavits submitted by Austin J. Shelton II and John Pangelinan challenge the alignment of the reels, they do not deny the presence on each machine of reels with insignia. Therefore, it is uncontroverted that the machines satisfy the threshold requirement of § 1171(a)(1).[4]

## II

For a "slot machine" to be a "gambling device," however, it must, in addition, fall within one of two statutory alternatives.[5] The statute requires that the machine either "(A) ... when operated may deliver, as the result of the application of an element of chance, any money or property," or "(B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property." 15 U.S.C. § 1171(a)(1), (a)(2) (1976).

An action brought by the United States for forfeiture is subject to a motion under Federal Rule of Civil Procedure 56. *See 6 Moore's Federal Practice* ¶ 56.17[26], at 56–863 to 64 (2d ed. 1980). As such, the burden is on the moving party to establish that there is no triable issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, 154 (1970). In reviewing the grant or denial of a motion for summary judgment, this Court applies the same test that is employed initially by the trial court. *Great*

*Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1254 (9th Cir. 1976). Summary judgment is proper "only when there is no genuine issue of any material fact or when viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law." *Gaines v. Haughton*, 645 F.2d 761, 769 (9th Cir. 1981), *citing Smith v. Gross*, 604 F.2d 639, 641 (9th Cir. 1979). Therefore, the Government had the burden of establishing that there was no genuine issue of fact as to whether the machines were "gambling devices" and, in evaluating whether the Government carried that burden, the Court must examine the materials presented in the manner most favorable to the claimant.

## A

As to alternative (A), there is nothing in the Government affidavits, nor elsewhere in the Record, that would indicate, nor do the photographs of the machines demonstrate, that the machines could operate so as to actually deliver, or pay out, coins or awards, which would be "money or property." The district court found that the machines have "reels or drums and are designed to collect and payout coins," and that the photographs show that "each of the nine machines do contain such slots and jackpot trays, along with reels or drums.[6] That finding, as well as the statement in the Affidavit of Special Agent Green that "[e]ach machine contains a pay-out tray for the return of jackpots or other awards," merely restate that which is evident from the photographs themselves: that the machines have trays in which jackpots could be received, *if* the machines, when operated,

---

**3.** The majority discusses "slots" and "trays for payouts or jackpots" on the machines and cites § 1171(a)(1)(B). *See* Majority Opinion at 699.

**4.** There is, therefore, no need to reach the issue of whether the machines in question were "designed and manufactured primarily for use in connection with gambling," so as to fall within § 1171(a)(2).

**5.** This additional requirement is also necessary for machines to be "gambling devices" under definition § 1171(a)(2).

**6.** The majority, too, apparently relies, in part, on the photographs to conclude that the machines are "gambling devices." *See* Majority Opinion at 699.

could deliver money or property. The mere presence of slots and trays does not establish that the internal operation of the machines would make them capable of dispensing coins or other property therein as winnings.[7] The Government, therefore, failed to carry its burden of showing that the machines are within alternative (A) of either definition (a)(1) or (a)(2).[8]

### B

Consequently, the majority appears to concede that the Government must have relied on alternative (B), which requires that "a person may become entitled to receive . . . money or property" by operating the machine.[9] Where, as here, the machines do not have the capability of actually delivering money or property, but award only free games, there must be mechanisms whereby the number of free games accumulated can be recorded by a meter. As Special Agent Leahy's Affidavit explains, it is through the operation of total plays meters, replays meters, and replay registers, which enable a proprietor to calculate total plays, replays awarded, and free plays played off, for purposes of recordation and cancellation of free games, that makes possible the redemption of free plays for money.

The legislative history of the Gambling Devices Act of 1962, which substituted the present § 1171(a)(2) for its predecessor,[10] makes clear that a machine must be capable of having free plays redeemable in cash.[11] In H.R.Rep. No. 1828, which explained the committee bill that became the 1962 Act, the House Committee focused on the need to subject to the provisions of the Johnson Act new sorts of gambling devices, possibly controlled by syndicated crime, which were not coin-operated, did not pay off directly or indirectly, and did not have drums or slots. See H.R.Rep. No. 1828, 87th Cong., 2d Sess., reprinted in [1962] U.S.Code Cong. & Ad.News 3809, 3811. Those machines were principally "pinball machines" that afforded the players an opportunity to "register a great number of free games," and which usually had a mechanism whereby the odds could be changed or the number of balls played could be increased by inserting more money. The free games could be

---

7. The Supplemental Affidavit of John Pangelinan, moreover, states that " '[e]ach machine' *does not* have a 'return of jackpots or other awards.' " [emphasis in original]. At the very least, this controverts Special Agent Green's averment that the machines, as a group, all have the capability of returning jackpots.

8. It appears from the affidavits that winnings are awarded solely in the form of free plays and that, therefore, the machines could not, in any event, be within alternative (A). Both the legislative history of the Gambling Devices Act of 1962 and the cases make clear that devices that award a few free games do not "deliver" money or property. See H.R.Rep. No. 1828, 87th Cong., 2d Sess., reprinted in [1962] U.S. Code Cong. & Ad.News 3809, 3811; cf. United States v. Korpan, 354 U.S. 271, 276, 77 S.Ct. 1099, 1102, 1 L.Ed.2d 1337, 1341 (1957) (distinguishing, in context of tax statute, "slot-machines" from "machines played purely for amusement which offered the player no expectation of receiving 'cash, premiums, merchandise, or tokens' "); Hannifin v. United States, 248 F.2d 173, 175 (9th Cir. 1957) (machine is within § 1171(a) if owner pays player for points accumulated).

9. See Majority Opinion at 699.

10. Prior to its amendment, § 1171(a)(2) had defined "gambling devices" as machines operable by means of "insertion of a coin." 15 U.S.C. § 1171(a)(2) (1951) (amended 1962).

11. The discussion in the legislative history of how a machine could be capable of creating an entitlement is in the context of definition § 1171(a)(2) and not § 1171(a)(1). The language of alternative (a)(2)(B) is, however, identical to that of (a)(1)(B). It is a well-established principle of statutory construction that "the same words or phrases are presumed to have the same meaning when used in different parts of a statute." Chugach Natives, Inc. v. Doyon, Ltd., 588 F.2d 723, 725 (9th Cir. 1978), citing United States v. Gertz, 249 F.2d 662, 665 (9th Cir. 1957); Sampsell v. Straub, 194 F.2d 228, 230 (9th Cir. 1951); cert. denied, 343 U.S. 927, 72 S.Ct. 761, 96 L.Ed. 1338 (1952). This general presumption may be rebutted only if the same phrases are used in "*different* parts of the statute with manifestly different intent." [emphasis in original]. Id. at 726. There is no showing that Congress intended alternative (B) in (a)(1) to have a meaning different than that in (a)(2)(B). Therefore, congressional intent as to what is required to satisfy (a)(2)(B) must be read to apply to (a)(1)(B).

played off or eliminated from the machine. When the accumulation of free games eliminated can be recorded by meters, "payment" for the canceled games could be made to the player by the proprietor or owner of the establishment where the machine was located. The Report made clear that "machines" that were "intended for amusement only, which award a limited number of free plays that are not convertible to money or other things of value are not covered by this legislation." U.S.Code Cong. & Ad.News, *supra*, at 3811.

Thus, the machines in this case would not be "gambling devices" that can create an entitlement, within the meaning of alternative (B), unless they have meters that record accumulated free plays and free plays played off, along with a mechanism that allows the proprietor to calculate the number of free games that have been eliminated from the machine without actually having been played off. The Leahy Affidavit states that each of the machines has a "total plays meter," "replays meter," and "replay register" and that free games can be eliminated, without having been used in play, either by using buttons that control the increase of free games awards so as to decrease the number showing on the replay register, or with an apparatus that clears the replay register. Special Agent Leahy states that, through these meters, the number of free games so eliminated can be calculated. These facts, if uncontroverted, would have been sufficient to find that the Government carried its burden of demonstrating that the machines were within alternative (B).

However, the Affidavit of Austin J. Shelton II states that none of the machines have "total plays meters," that none of the machines have "replays meters," that the method of calculation to determine the number of free games eliminated without having been played off, as explained by the Leahy Affidavit, is "wholly false and no-existent [sic]," and that only some of the machines have "replay registers." This Affidavit, then, controverts material facts as to each and every machine.[12] There remains, therefore, a genuine issue of material fact as to whether all the machines have the meters that are requisite for the capability of creating an entitlement to money or property within the meaning of alternative (B) of either definition.[13]

III

The Government did not carry its burden of establishing that there were no triable issues as to whether each and every machine satisfies either alternative (A) or (B) of definition § 1171(a)(1) or (a)(2). Because summary judgment was, therefore, inappropriate, I would reverse.

---

**12.** The Pangelinan Supplemental Affidavit states that three of the four models, comprising four of the nine machines seized, do not have replay registers, or any other similar device. It appears, therefore, that the machines should not have been grouped for the purposes of finding, as did the district court, that "there can be no question that these machines are gambling devices under the purview of 15 U.S.C. 1171 et seq."

**13.** The majority holds that there is no genuine issue of fact because the Shelton and Pangelinan Affidavits set forth, at best, experts' opinions, and not "specific facts," as contemplated by Fed.R.Civ.P. 56(e). Because the majority concludes that neither "expert" stated facts to support his opinion that the machines were not "gambling devices," it holds that there is no "genuine issue as to any material fact," within the meaning of Fed.R.Civ.P. 56(c). Although I decline to express any view as to whether an expert opinion unsupported by facts can create a genuine issue of fact, the majority approach, along with that of the district court, ignores the clearly factual dispute as to the presence or absence of the requisite meters and registers on each machine.