84 F.3d 1162
 96 Cal. Daily Op. Serv. 3752, 96 Daily Journal
D.A.R. 6115
Jeanette REYNOLDS, as Administrator of the Estate of Paul
Reynolds, deceased, and individually, Plaintiff-Appellant,
v.
COUNTY OF SAN DIEGO; Jeffrey Jackson, Jim Roache, Sheriff,
Defendants-Appellees.
Denise REYNOLDS, Plaintiff-Appellant,
v.
COUNTY OF SAN DIEGO; Jeffrey Jackson, Jim Roache, Sheriff,
Defendants-Appellees.
 No. 94-56262.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 6, 1996.
Decided May 28, 1996.
 
 1
 Michael L. Crowley, San Diego, California, for plaintiffs-appellants.
 
 
 2
 Gerald P. Schneeweis, Douglas J. Collodel, and Richard H. Nakamura, Jr., Morris, Polich & Purdy, San Diego, California, for defendant-appellee Jackson.
 
 
 3
 Appeal from the United States District Court for the Southern District of California, John S. Rhoades, District Judge, Presiding. D.C. Nos. CV-92-01342-JSR, CV-93-0194-JSR.
 
 
 4
 Before: PREGERSON, T.G. NELSON, Circuit Judges, and GEORGE,* District Judge.
 
 
 5
 Opinion by Judge GEORGE; Dissent by Judge PREGERSON.
 
 GEORGE, District Judge:
 
 6
 Paul Reynolds ("Reynolds") was shot to death by Deputy Jeffrey Jackson ("Jackson") during an altercation near a gas station. Plaintiffs-appellants Jeanette and Denise Reynolds, decedent's wife and mother respectively, challenge the district court's determination that defendant-appellee Deputy Jackson was entitled to summary judgment against their civil rights claims because he was protected from liability under the doctrine of qualified immunity. Appellants also dispute the district court's holding that there is no basis for liability against Jackson under California Civil Code Section 52.1 nor under state tort claims for negligence and wrongful death. This court has jurisdiction over appeals from final judgments under 28 U.S.C. §§ 1291 and 1294. We affirm in part and remand in part.
 
 I. FACTS AND PROCEDURAL BACKGROUND
 
 7
 At approximately 1:00 a.m. on February 18, 1992, Joseph Kirchevel, a gas station attendant, noticed the decedent, Paul Reynolds, behaving in a strange manner near the gas pumps. As Reynolds approached the window, Kirchevel asked if he could help Reynolds. Reynolds responded, "Yes, I think you can," and placed his face up against the glass of the service window. Reynolds then walked away from the window, picked up a squeegee, and started swinging it back and forth. Reynolds placed the squeegee on the cashier's tray at the service window, Kirchevel asked Reynolds to replace the squeegee and called the Sheriff's department. After calling the department, Kirchevel noticed that Reynolds had drawn a knife.[1] Kirchevel contacted the Sheriff's department again and informed them that Reynolds now had a weapon.
 
 
 8
 At this time, appellee Deputy Jeffrey Jackson was on routine patrol in the area. Thomas Cornish, a passerby, stopped Deputy Jackson and told him that someone was acting strangely down the road and appeared to have some type of bottle in his hand. Deputy Jackson proceeded to the location specified by Cornish. As Deputy Jackson approached the gas station he noticed Reynolds's car stopped in the roadway, blocking traffic with the driver's side door open.
 
 
 9
 Deputy Jackson exited his vehicle and proceeded toward Reynolds's car on foot. While he was standing next to Reynolds's car, Robert Wapnowski, a truck driver who was delivering gasoline to the station, yelled at Jackson to stop Reynolds. Wapnowski also indicated that Reynolds had some kind of knife. Jackson saw Reynolds being chased from the gas truck by Wapnowski. Jackson drew his gun and told Reynolds to stop. Jackson noticed that Reynolds was holding a knife and ordered him to put his hands in the air. Reynolds complied, and about this time, Michael Tucker, a passing motorist, stopped to observe the incident.
 
 
 10
 After Reynolds placed his hands in the air, he walked to the middle of the road. Deputy Jackson followed and told Reynolds to get on the ground, Reynolds complied. Jackson then moved toward Reynolds and told him to drop the knife. Reynolds put the knife on the ground next to his body. According to Wapnowski, Jackson then slowly approached Reynolds, repeatedly telling Reynolds not to move. Nevertheless, as Jackson moved closer, it is undisputed that Reynolds suddenly sat up and grabbed the knife.
 
 
 11
 Deputy Jackson alleges that he then moved behind Reynolds and attempted to disarm Reynolds by kicking him, but that he missed. Wapnowski, however, did not see Jackson's attempt to kick Reynolds. In addition, in his first interview after the incident, Jackson did not mention that he tried to disarm Reynolds by kicking him.
 
 
 12
 Deputy Jackson continued to move toward Reynolds from behind and eventually put his knee in Reynolds's back and his gun on Reynolds's neck. Again, Jackson ordered Reynolds to drop the knife. Instead, it is undisputed that Reynolds twisted his body and made a sudden, backhanded, upward swing toward Jackson with his right hand which was holding the knife. According to Wapnowski, "[Reynolds's] whole body--it looked like his whole body has twisted to the right. Just--that's all I can say. He just turned to his right real quick like that. And that was after he was warned not to move." Michael Tucker, the motorist who stopped to observed the incident, saw the weapon in Reynolds's hand and Reynolds "swinging" it toward Deputy Jackson.
 
 
 13
 At this time, Deputy Jackson stated that he feared for his life and pulled the trigger on his gun, but the gun did not fire. Jackson immediately pulled the trigger again. According to Jackson, he took half a step back before pulling the trigger again and fired the gun approximately six inches from Reynolds's neck. This time the gun fired. Reynolds died of a single gunshot wound to the neck.
 
 
 14
 Richard Whalley, a forensic criminologist and one of appellants' experts, speculates that Jackson's gun did not fire the first time because it was pressed too hard into Reynolds's neck. In addition, Whalley believes that the fatal wound was made while the gun was actually in contact with Reynolds's neck, rather than six inches away.
 
 
 15
 Following the incident, Jeanette and Denise Reynolds, the decedent's wife and mother respectively, each filed a civil rights action against Deputy Jackson, San Diego County Sheriff Jim Roach, and the County of San Diego, alleging that Jackson's use of force was unreasonable and that Roach and the County were liable for Jackson's actions because they failed to enforce laws and regulations pertaining to the use of deadly force. Both appellants also invoked the district court's pendent jurisdiction to consider claims under California Civil Code Section 52.1 and various state law claims including wrongful death, excessive force, assault and battery, negligence, and negligent hiring. Jeanette Reynolds also sued for loss of consortium and violation of the California Public Records Act. Appellants' actions were consolidated.
 
 
 16
 Deputy Jackson filed a motion for summary judgment, which the County of San Diego and Sheriff Jim Roach joined. According to the district court, the joinder did not properly specify which of Jackson's legal arguments applied to the County and which applied to Roach. Therefore, the district court denied the County of San Diego's and Roach's motions for summary judgment.[2]
 
 
 17
 The district court granted Deputy Jackson's motion for summary judgment for all allegations directed against Jackson in the complaint. Reynolds v. County of San Diego, 858 F.Supp. 1064 (1994). The court determined that Jackson was immune from liability for the appellants' civil rights claims because he acted reasonably under the circumstances. In addition, the court ruled that Deputy Jackson was immune from appellants' state law claims for negligence and assault and battery, and Jeanette Reynolds's claim of wrongful death. Moreover, the court ruled that Denise Reynolds did not have standing under California state law to bring a state law wrongful death action because she is neither the intestate heir of the decedent nor was she dependent on the decedent. Finally, the court found that Jeanette Reynolds could not maintain a cause of action under California Civil Code Section 52.1.[3]
 
 II. STANDARD OF REVIEW
 
 18
 The district court's decision to grant a motion for summary judgment is reviewed de novo. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). The court may affirm on any ground supported by the record. In re Apple Computer Secs. Litig., 886 F.2d 1109, 1112 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).
 
 III. DISCUSSION
 
 19
 Appellants appeal the district court's grant of summary judgment in favor of Jackson on their federal civil rights claims. They contend that because there are genuine issues of material fact regarding the reasonableness of Jackson's conduct, the district court erred in determining that Jackson was entitled to summary judgment on the issue of qualified immunity. Additionally, Jeanette Reynolds maintains that the district court erred in determining that she has no cause of action under California Civil Code Section 52.1. Appellants also state that the district court erred in granting summary judgment to Jackson on appellants' negligence and wrongful death actions.[4] Appellants, however, do not argue that the district court's finding that Denise Reynolds lacks standing to pursue a wrongful death claim was error. Therefore, the court considers that issue waived. See Miller v. Fairchild Industries, Inc., 797 F.2d 727, 738 (9th Cir.1986), cert. denied, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).
 
 A. Summary Judgment Standard
 
 20
 Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is only proper where the pleadings, discovery, and affidavits show that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden," Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), while leaving "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts" to the jury. Id. at 255, 106 S.Ct. at 2513. Once the moving party meets its initial burden, a nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists and that a reasonable jury could return a verdict for the nonmoving party. Hughes v. United States, 953 F.2d 531, 541-42 (9th Cir.1992); Lindahl v. Air France, 930 F.2d 1434, 1436-37 (9th Cir.1991) (citing Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986)); Fed.R.Civ.P. 56(e).
 
 B. Civil Rights Claims
 
 21
 The Supreme Court has ruled that to hold an official liable for violating an individual's constitutional rights, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Hunter v. Bryant, 502 U.S. 224, 226, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (qualified immunity protects officials from liability if a reasonable officer could have believed his actions were lawful in light of clearly established law and the information the officer possessed). The Court has given further instruction on this standard by stating that, viewed in light of pre-existing law, the unlawfulness of the official action must be apparent. Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. The standard therefore provides that " 'regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the appellant was "not clearly established" or the officer could have reasonably believed that his particular conduct was lawful.' " DeNieva v. Reyes, 966 F.2d 480, 484-85 (9th Cir.1992) (quoting Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.1991)). Finally, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter, 502 U.S. at 227, 112 S.Ct. at 536 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). We thus have acknowledged that immunity issues should be "determined by the district court at the earliest possible point in the litigation" and "[w]here the underlying facts are undisputed, a district court must determine the issue on a motion for summary judgment." Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir.1993).
 
 
 22
 Given this interpretation, we make three inquiries to determine whether the defense of qualified immunity is available to an officer. First, we identify the right which was allegedly violated. Second, we determine whether the law governing the official's conduct is clearly enough established to alert a reasonable officer to its constitutional parameters. Third, we consider whether, under that law, a reasonable officer could have believed that his conduct was lawful DeNieva, 966 F.2d at 484-85; Act Up!/Portland, 988 F.2d at 871.
 
 
 23
 Appellants allege that Deputy Jackson violated their constitutional rights because he wrongfully used deadly force in his encounter with Reynolds, thereby depriving them of his companionship. "There is no question that the apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Curnow v. Ridgecrest Police, 952 F.2d 321, 324 (9th Cir.1991), cert, denied, 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992). Appellants dispute only the third prong of the test, maintaining that a reasonable officer in Jackson's situation would not have believed that the use of deadly force was lawful.
 
 
 24
 A reasonable officer's belief that his conduct was lawful must be analyzed under an objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872-73, 104 L.Ed.2d 443 (1989). In conducting such an analysis, the court must balance the nature and quality of the intrusion against the governmental interests at stake. Curnow, 952 F.2d at 324-25. "The court's inquiry is therefore whether the totality of the circumstances (taking into consideration the facts and circumstances of the particular case; including the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade arrest by flight) justified the particular type of seizure." Id. at 325. The Supreme Court has held that an officer's use of deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985). All determinations of unreasonable force, however, "must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S.Ct. at 1872.
 
 
 25
 Under this standard, Deputy Jackson's use of deadly force was reasonable. Given Reynolds's erratic behavior and the fact that he had a weapon, it was reasonable for Jackson to attempt to restrain him. Cornish had told Jackson of Reynolds's strange behavior. Upon arriving at the scene, Jackson heard Wapnowski call out at him to stop Reynolds. The gas station attendant also perceived Reynolds as a threat--twice calling the Sheriff's Department to report Reynolds's behavior. It was thus reasonable for Jackson to consider Reynolds a threat to the people in the area. Moreover, it was reasonable for Jackson to attempt to disarm Reynolds by approaching him from behind and by telling him to drop the weapon. Reynolds was not in a confined area and there were other people in the vicinity. Finally, under the circumstances, it was reasonable for Deputy Jackson to fire his weapon. He had warned Reynolds to drop the weapon and not move. Up to that point, Reynolds had complied with some of Jackson's commands. Jackson, therefore, had no reason to believe Reynolds did not understand his orders. By suddenly swinging at Jackson with the knife, Reynolds threatened Jackson's life or at least put him in fear of great bodily injury. Therefore, the district court correctly ruled that Jackson was immune from liability.
 
 
 26
 Appellants argue that the trial court erroneously extended the doctrine of qualified immunity. According to appellants, it was error for the district court to find that immunity questions should be resolved at the earliest possible stage of litigation.[5] Appellants contend that in Sloman v. Tadlock, 21 F.3d 1462, 1468 (9th Cir.1994), the court questioned whether the ultimate determination of the objective reasonableness of an officer's actions should be left to the judge or the jury. In Sloman, the court stated that there is no reason to think that having the jury rather than the judge assess the reasonableness of officer's conduct would be inimical to the policies that govern immunity. However, this observation was made in the context of a discussion about whether the judge or jury should make the reasonableness determination where "officials are forced to go to trial because their right to immunity turns on the resolution of disputed facts"--not in the context of a summary judgment which is intended to test the existence of genuine issues of fact. Indeed, in Sloman, we reiterated that in the context of a motion for summary judgment, "immunity 'ordinarily should be decided by the court' and should not 'routinely' be sent to the jury," 21 F.3d at 1467 (quoting Hunter v. Bryant, 502 U.S. at 228, 112 S.Ct. at 537), and that in "the 'ordinary' or routine case it should be decided at the earliest possible moment to spare the appellee the trauma of trial or its anticipation." Id. at 1468.
 
 
 27
 Appellants also maintain that summary judgment in favor of Jackson was inappropriate because genuine issues of material fact exist regarding the reasonableness of Jackson's conduct. They claim that the expert testimony of criminologist Richard Whalley and police tactics expert Lou Reiter creates a genuine issue of material fact regarding the reasonableness of Jackson's conduct.
 
 
 28
 In his deposition, Whalley testified that Jackson caused Reynolds to make the sudden movement by pressing his gun so hard into Reynolds's neck. According to Whalley, Reynolds was turning around to see what was pressing into his neck. Whalley also concluded that Reynolds's wound was a contact wound, suggesting that Jackson's gun was actually touching Reynolds's neck when it was fired rather than being six inches away as Deputy Jackson had reported. According to appellants, "[i]f the jury was to believe the findings and testimony of Whalley they would have to disbelieve Deputy Jackson's testimony in whole or at least in part and would likely find for the appellants."
 
 
 29
 Whalley's conclusion that Jackson caused Reynolds to move suddenly fails to raise an issue of material fact about the reasonableness of Jackson's conduct. Whalley conducted tests on the same type of gun Jackson used and determined that the gun would not fire when eight pounds of pressure were on a mechanism of part of the gun. Whalley speculates that the same amount of pressure must have been applied to Reynolds's neck when Jackson first pulled the trigger and the gun did not fire. Whalley then extrapolates that Reynolds suddenly moved in response to the pressure that was placed on his neck. Whalley bases this conclusion not on any scientific or medical knowledge, but rather on this "understanding of human nature and human factors and working in gunshot cases." The tests Whalley conducted may raise an issue of fact regarding why the gun did not fire-an immaterial issue; however; the conclusions about why Reynolds moved are nothing more than speculation and fail to raise an issue of fact about the reasonableness of Jackson's conduct-a material issue. United States v. Various Slot Machines on Guam, 658 F.2d 697, 700 (9th Cir.1981) ("in the context of a motion for summary judgment, an expert must back up his opinion with specific facts"); Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir.1985) (a party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support his conclusory allegations).
 
 
 30
 While we have recognized that a claim of excessive force may be based on a showing that officers "used excessive force in creating the situation which caused [the decedent] to take the actions he did," Alexander v. City of and County of San Francisco, 29 F.3d 1355, 1366 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995), such a claim must be analyzed under the reasonableness standard. Id. ("a police officer's use of force in apprehending a suspect violates the Fourth Amendment if it is unreasonable in light of the facts and circumstances confronting the officer") (citing Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)). In Alexander, we determined that a factual issue existed regarding whether police officers used excessive force when they stormed the house of a man who they knew to be a mentally ill, elderly, half-blind recluse who had threatened to shoot anyone who entered. Id. at 1366-67.
 
 
 31
 Nevertheless, as the Supreme Court explained in Graham, when assessing the reasonableness of an officer's conduct, the court must allow for the fact that officers are forced to make split second decisions in tense situations. An officer cannot be expected to accurately anticipate all of the possible responses a subject may have to his commands and then tailor his actions accordingly in order for his conduct to fall into the category of what is considered reasonable. Thus, even if Jackson was applying some pressure to Reynolds's neck with his gun, his conduct still falls within the parameters of what is reasonable given that he was in a rapidly evolving situation and was dealing with a subject who was behaving strangely, had a weapon, and posed a threat of serious injury to others in the area.
 
 
 32
 Appellants contend that the discrepancy between Jackson's statement that he shot from six inches away and Whalley's conclusion that Reynolds suffered a contact wound would cause a reasonable jury to discount Jackson's testimony and find for the appellants. This alleged discrepancy fails to raise a genuine issue of material fact regarding the reasonableness of Jackson's use of force. Cases involving an officer's use of deadly force can pose difficult problems for determining the reasonableness of the officer's conduct because the officer appellee is often the only surviving eyewitness. See Hopkins v. Andaya, 958 F.2d 881, 885-88 (9th Cir.1992), cert. denied, --- U.S. ----, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995). In such cases, the court must examine all of the evidence in the record as well as any expert testimony to determine if the officer's story is internally consistent and consistent with other known facts. Id. Here, however, the material aspects of Jackson's version of events is corroborated by two independent eyewitnesses. Both Wapnowski and Tucker testified that Reynolds suddenly swung at Jackson. Furthermore, appellants fail to explain how the inconsistency regarding the distance of the gun from Reynolds when fired suggests that the use of force was unreasonable. Illuminating a potential minor inconsistency in Deputy Jackson's version of events is insufficient to raise a genuine issue of material fact regarding the reasonability of the use of force, particularly given the independent eyewitness testimony. City of Vernon v. Southern Cal. Edison Co., 955 F.2d 1361, 1369 (9th Cir.), cert. denied, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992) (a party cannot defeat a summary judgment motion by producing a "mere scintilla of evidence to support its case"); Neely v. St. Paul Fire and Marine Ins. Co., 584 F.2d 341, 344 (9th Cir.1978) (while summary judgment is improper if sufficient evidence supporting a claimed factual dispute is adduced, "this evidence must be 'significantly probative' of the disputed fact").
 
 
 33
 Similarly, appellants allege that police tactics expert Lou Reiter's testimony creates a genuine issue of material fact regarding the reasonableness of Jackson's use of deadly force. In his deposition, Reiter stated that Jackson used "reckless" tactics to restrain Reynolds. Reiter concluded that Jackson should have called for back-up, talked to Reynolds in calm tones, and refrained from approaching Reynolds while he had the knife. Plaintiffs argue that Reiter's testimony creates a genuine issue of material fact regarding whether his conduct was objectively reasonable.
 
 
 34
 Reiter's findings, however, are insufficient to raise a genuine issue of material fact regarding the reasonability of Jackson's use of force. The fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable. The inquiry is not "whether another reasonable or more reasonable interpretation of events can be constructed ... after the fact." Hunter, 502 U.S. at 228, 112 S.Ct. at 537. Rather, the issue is whether a reasonable officer could have believed that his conduct was justified. "This is so notwithstanding that reasonable officers could disagree on the issue." Act Up!/Portland, 988 F.2d. at 872. Given that Reynolds was behaving in a strange manner and wielded a knife, it was reasonable for Jackson to try to confine and attempt to disarm him. In addition, because Reynolds's sudden swing at Jackson threatened the officer with death or at least great bodily injury and, if successful in disabling the police officer, others in the area could have been in great danger, it was reasonable for Jackson to respond with deadly force. The fact that Reiter disagrees with the steps Jackson took is not enough to raise a genuine issue of material fact regarding the reasonability of Jackson's conduct.
 
 
 35
 C. Claims under California Civil Code Section 52.1
 
 
 36
 Appellants appeal the district court's ruling that summary judgment was proper as to Jeanette Reynolds's claim under California Civil Code Section 52.1. Appellants maintain that California Civil Code Section 52.1 "by its terms creates a cause of action under the California Constitution" and that the statute "represents an independent state basis for liability." Appellants argue that the district court erred in dismissing the claim because there is "no authority for the proposition that federal qualified immunity standards apply to the California Constitution."
 
 
 37
 Appellants misinterpret the reasoning of the district court on this issue. California Civil Code Section 52.1 provides that:
 
 
 38
 (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may-institute and prosecute in his or her own behalf a civil action for damages including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right secured or rights secured.
 
 
 39
 As the district court explained, Section 52.1 does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations. Appellants, however, fail to specify any conduct of Jackson's that constituted a violation of the state constitution but not the federal constitution. In other words, appellants have not accused Jackson of violating any state constitutional right which is separate and distinct from federal protections. Therefore, because there is no federal constitutional violation and no conduct specified which constitutes a state constitutional violation, there is no conduct upon which to base a claim for liability under 52.1. Thus, the district court properly granted summary judgment in favor of Jackson as to Jeanette Reynolds's Section 52.1 claim.
 
 D. State Tort Law Claims
 
 40
 Appellants also appeal the district court's grant of summary judgment in favor of Jackson on plaintiffs' state tort law claims.
 
 
 41
 In United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court noted the existence of pendent jurisdiction over related state law claims, but stressed that the power to assert pendent jurisdiction need not be exercised. Id. at 725-26, 86 S.Ct. at 1138-39. The Court explained, "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." Id. In Hodge v. Mountain States Tel. & Tel. Co., 555 F.2d 254, 261 (9th Cir.1977), a district court had granted summary judgment on a plaintiff's federal and state claims. Relying on different reasons than the district court, we affirmed the summary judgment in favor of the defendant as to the federal claims. However, following Gibbs, we explained, "[i]n light of our disposition of the federal claims, we feel that it is appropriate to remand the state law claims to the district court with instructions to dismiss for want of federal jurisdiction." Id.
 
 
 42
 More recently, the Circuit vacated a district court's judgment dismissing both state and federal claims. We determined that the district court did not err in dismissing the pendent state law claims after all of the federal claims were dismissed, but vacated "the judgment with instructions that it be modified to make clear that dismissal of the pendent claims [was] without prejudice." Gini v. Las Vegas Metropolitan Police Dept., 40 F.3d 1041, 1046 (9th Cir.1994). The court explained that " '[i]n the usual case in which federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state law claims.' " Id. (quoting Schneider v. TRW. Inc., 938 F.2d 986, 993 (9th Cir.1991)); see also Wren v. Sletten Const. Co., 654 F.2d 529, 536 (9th Cir.1981) ("When the state issues apparently predominate and all federal claims are dismissed before trial, the proper exercise of discretion requires dismissal of the state claim." (emphasis added)).
 
 
 43
 Similar to Hodge, in this case the district court granted summary judgment on plaintiffs' federal and state claims. Instead, after granting summary judgment on the civil rights claim, the court should have dismissed the state law claims without prejudice. Therefore the state tort law claims are REMANDED to the district court with instructions to dismiss without prejudice for want of federal jurisdiction.
 
 
 44
 AFFIRMED in part and REMANDED in part.
 
 PREGERSON, Circuit Judge, dissenting:
 
 45
 This case raises the question whether Deputy Jackson was entitled to qualified immunity when he used deadly force against Paul Reynolds. The answer to that question depends on whether "the totality of the circumstances ... justified the particular type of seizure" that sadly was carried out by Deputy Jackson. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir.1991). Because material factual questions remain unanswered, I believe a jury should determine whether the totality of the circumstances that Deputy Jackson faced warranted his use of deadly force against Reynolds. Sloman v. Tadlock, 21 F.3d 1462, 1468 (9th Cir.1994). Accordingly, I dissent.
 
 
 46
 I agree that we should not use the "20/20 vision of hindsight" to second guess the actions of police officers when they use deadly force to defend themselves from imminent harm. Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989). But this does not mean that a finding of qualified immunity is automatic. Rather, courts must assess whether the use of deadly force to effect a seizure was reasonable according to the requirements of the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Part of this analysis requires us to determine whether the suspect posed "a threat of serious physical harm either to the officer or to others." Id. at 11, 105 S.Ct. at 1701. This inquiry is usually a question of fact for the jury. Sloman, 21 F.3d at 1468; Hopkins v. Andaya, 958 F.2d 881, 885 (9th Cir.1992).[1]
 
 
 47
 I am concerned that the facts as stated in the majority opinion leave unanswered factual questions regarding the actual threat of serious physical harm that Reynolds, who was sitting on the ground, posed to Deputy Jackson. Before he used lethal force, Deputy Jackson had his knee in Reynolds's back and the barrel of his gun on Reynolds's neck. Reynolds then suddenly "twisted" to the right, "swinging" a three-inch marlin spike in a backward motion towards Deputy Jackson. Jackson pulled the trigger of his gun, but the gun failed to fire. Jackson then stepped back and successfully fired his gun directly at Reynolds's neck. In these circumstances a jury could reasonably conclude that Deputy Jackson should have dealt with the threat by using a billy club to subdue Reynolds, by stepping back further and trying to talk him into submitting, or by using other non-deadly means to take Reynolds into custody.
 
 
 48
 A jury could also find that Reynolds posed no threat to the public that would require an immediate deadly seizure of his person. There is no indication that Reynolds was trying to escape. If anything, the facts depict a disoriented individual, perhaps in need of medical attention, rather than someone attempting to kill or commit violent mischief against another person. Given these facts, a reasonable jury could have concluded that Reynolds did not actually pose a "threat of serious physical harm either to the officer or to others." Garner, 471 U.S. at 11, 105 S.Ct. at 1701. Such a finding would preclude a grant of qualified immunity in this case. See Alexander v. City and County of San Francisco, 29 F.3d 1355, 1356 (9th Cir.1994) (Kozinski, J., concurring) (noting that in dealing with "a half-blind recluse, an eccentric, perhaps in need of medical attention," who posed a non-dangerous nuisance to the community, the use of deadly force was a "massive[ly] disproportional[ ]" response to the problem).
 
 
 49
 In short, I believe a reasonable jury could conclude that Deputy Jackson's seizure of Reynolds evinced an unwarranted use of deadly force, especially because the facts could support a finding that Reynolds posed no immediate threat of serious physical harm to the officer or other members of the community. I would reverse.
 
 
 
 *
 Honorable Lloyd D. George, Chief United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 The district court noted that Reynolds's weapon is referred to by the parties as both a "marlin spike" and a "knife." A marlin spike is a spike-shaped tool used for untying nautical knots. Reynolds's weapon is somewhat similar to a marlin spike. It has a blade that folds like a pocketknife and a spiked portion that is approximately three and one-half inches long. Thus, the weapon is referred to as both a "knife" and a "marlin spike."
 
 
 [2]
 At least as to the federal civil rights claims, if Deputy Jackson's actions were reasonable, there can be no municipal liability. "While liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights." Scott v. Henrich, 39 F.3d 912, 916 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995)
 
 
 [3]
 The district court's order discusses only Jeanette Reynolds's allegations under California Civil Code Section 52.1. Denise Reynolds's complaint also mentions 52.1 as a basis of liability. The district court's order did not specifically address whether Denise Reynolds lacked standing to pursue a claim under 52.1. Because appellants do not address in their opening brief whether Denise Reynolds has a cause of action under 52.1, the court may consider the issue waived. Nevertheless, the issues related to 52.1 are the same for both appellants
 
 
 [4]
 Appellants do not address the district court's finding that summary judgment was proper on their claims for assault and battery and excessive force. Nor does appellant Jeanette Reynolds dispute the district court's finding that summary judgment in favor of Deputy Jackson was appropriate for her violation of the California Public Records Act claim
 
 
 [5]
 The district court explained that, "the [Supreme] Court in Hunter noted that 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' " Reynolds, 858 F.Supp. at 1070 (citing Hunter v. Bryant, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991))
 
 
 [1]
 In excessive force cases, the issue of qualified immunity should be considered together with the question whether the use of deadly force was reasonable. As we explained in Hopkins:
 Police officers are entitled to assert a defense of qualified immunity from section 1983 liability if they reasonably believed in good faith that their actions were constitutional. In Fourth Amendment unreasonable force cases ... the qualified immunity inquiry is the same as the inquiry made on the merits.
 958 F.2d at 885 n. 3 (citations omitted).